Central Trust Company (by Consolidation with the Bank of America, Formerly Known as Greenebaum Sons Bank & Trust Company), Trustee, and Greenebaum Sons Investment Company, Defendants in Error, v. Calumet Company et al., Plaintiffs in Error.

**Gen. No. 34,735.**

Heard in the first division of this court for the first district at the October term, 1930. ▆▆▆▆ Opinion filed March 2, 1931.

CUTTING, MOORE & SIDLEY, for plaintiffs in error; NATHAN G. MOORE, of counsel.

POPPENHUSEN, JOHNSTON, THOMPSON & COLE, SHERMAN C. SPITZER, GEORGE GILLETTE and C. G. KINNEY, for defendants in error; JAMES W. HYDE, of counsel.

MR. JUSTICE McSURELY delivered the opinion of the court.

Defendants by this writ of error seek the reversal of a decree entered in conformity with the prayer of

complainants' bill to foreclose a trust deed dated July 9, 1918, securing an indebtedness of the defendant Calumet Company. The defendants attacking the decree are the beneficial owners of the property conveyed by the trust deed.

It is conceded that the Calumet Company received the money for which its bonds and trust deed were given and this was used in improving the premises conveyed as security. There is no claim that any of the indebtedness sought to be collected has been paid. As stated by the master in chancery, to whom the cause was referred to take evidence and report, defendants have not "sought to show that there is any moral or equitable defense to be made to the foreclosure of said trust deed."

It would make this opinion too long to attempt to notice all of the points made by counsel in their respective briefs. We shall therefore state only the affirmative reasons for our conclusions.

Defendants ask for reversal principally upon three grounds. It is asserted, first, that the instant trust deed is void. To support this it is claimed that the mortgagor at the time of its execution was a public utility corporation engaged in the cold storage business, and the statute provides that any mortgage by any public utility "made otherwise than in accordance with an order of the Commission authorizing the same . . . shall be void" (Cahill's St. ch. 111a, ¶ 42), and no such order was obtained. Plaintiffs reply that the mortgagor never at any time conducted a cold storage business and never became a public utility within the meaning of the statute. The master so found.

The name of the Calumet Company was originally the Gottfried Brewing Company, chartered in 1882 to manufacture and sell beer. In 1889 it increased its capital stock and changed its name to the Calumet Company and its corporate powers were enlarged, per-

mitting it to conduct a cold storage and general warehouse for public and private use. Although it is a sharply disputed point, yet the evidence clearly shows that, while the Calumet Company had the power under this enlarged charter to engage in the cold storage and warehouse business, yet in fact it never did so. It never applied for or received from the Illinois Public Utilities Commission or the Illinois Commerce Commission any certificate of convenience or necessity or other authorization to engage in such business.

April 10, 1906, the Purakwa Ice Company was chartered to manufacture and sell artificial ice. April 10, 1916, this company changed its name to the Calumet Refrigerating Company, increased its capital stock and amended its charter so as to include the right to carry on the cold storage business. April 28, 1916, it was awarded a certificate of convenience and necessity by the Public Utilities Commission authorizing it to engage in this business on the premises subsequently conveyed by the instant trust deed. The stockholders of the Calumet Company and of the Calumet Refrigerating Company were virtually the same.

In the years 1915–1916 the brewing business of the Calumet Company had become unprofitable and its officers and directors made plans for alteration of part of the premises into a cold storage warehouse to be leased to and used by the Refrigerating Company. Accordingly, some $40,000 was spent in doing this, and this portion was leased to the Refrigerating Company and the Calumet Company leased part of the remainder of the plant to other tenants and continued to use the rest of the premises in making beer. In May, 1916, the Refrigerating Company began to receive goods for cold storage. The brewing business subsequently became even more precarious and the officers of the Calumet Company then concluded to change the plant entirely from a brewery into a plant which could be

used for cold storage purposes and to lease the entire plant to the Refrigerating Company. In the early part of 1918 the Calumet Company ceased to manufacture anything on the premises and negotiated the loan secured by the trust deed in question with Greenebaum Sons Bank & Trust Company. The entire sum borrowed was $250,000, which was used in making these alterations on the property after paying the indebtedness of $40,000 which it had incurred in making the alterations in 1916. The space thus remodeled and equipped was leased to the Calumet Refrigerating Company at an increasing rental rate which in 1919 amounted to $30,000 a year. The Refrigerating Company continued to operate its business upon the premises until some time in September, 1924.

Both corporations kept their own separate bank accounts and at different banks. Each made its own deposits of its own funds and each exclusively made its own withdrawals. Each paid its own employees and every such employee rendered service only to the corporation paying him. Supplies required to conduct the cold storage business were bought and paid for by the Refrigerating Company only. Repairs and upkeep of the premises were paid for by the Calumet Company. Each corporation kept its own separate set of books. Bills for services rendered by the Refrigerating Company were collected by it and never by the Calumet Company.

Counsel for defendants argue that the Refrigerating Company was merely the agent for the Calumet Company and that the cold storage business was, in fact, the business of the Calumet Company. Various activities of the officers of the respective companies are presented in support of this theory. However, examination shows only that the officers of the Calumet Company who were at the same time officers of the Refrigerating Company did some things preliminary

to conducting the cold storage business by the Refrigerating Company. Among these activities was the expenditure of its own money in altering the premises; but for a landlord to equip and rebuild premises for leasing is an every day occurrence. A Mr. Brady occupied an office with the Calumet Company and in April, 1916, solicited business for the Refrigerating Company. This was another preliminary step to the cold storage business by the Refrigerating Company. Other similar activities are noted, but we do not deem them of controlling importance. An owner may build or equip his property intending to use it for a cold storage business or to lease it to some one else for that purpose. Until such property is offered to the public for that purpose it cannot be said to be devoted to that use, and it is the company which in fact offers its facilities to the public that is conducting a public utilities business and not necessarily the landlord owner of the premises, as is the case here. In *Austin Bros. Transfer Co. v. Bloom,* 316 Ill. 435, it was held that "property becomes clothed with a public interest when used in a manner to make it a public consequence and affects the community at large." To the same effect is *Utilities Commission v. Bethany Mut. Tel. Ass'n,* 270 Ill. 183, where it was held that the purpose of the Public Utilities Act, Cahill's St. ch. 111a, was to bring under control property "as long as such public use is maintained." The same language is found in *Munn v. Illinois,* 94 U. S. 113, where it was held, in effect, that the act applies only so long as the owner maintains the use in which the public has an interest and not when this use is discontinued. See also *State v. Pub. Service Comm.,* 275 Mo. 483. In *Springfield Gas & Electric Co. v. Springfield,* 292 Ill. 236, it was held that the act applied to corporations owning and operating public utilities; otherwise the commission could have no authority whatever over it.

We cannot agree with the contention that the Calumet Company must be regarded as engaged in a public utility business because at the time the instant mortgage was made it had the charter power to engage in this business. No certificate, as required by statute, was issued to the Calumet Company authorizing it to engage in the cold storage business. It has been repeatedly held that the fact that under its articles of incorporation a company might have engaged in a public utility business does not *ipso facto* make it so. The charter merely gives a naked authority to do the business, but until the business is actually operated it does not make the company a public utility. *DePauw University v. Public Serv. Comm.,* 253 Fed. 848; *State v. Public Serv. Comm.,* 275 Mo. 483; *Del Mar Water, Light & Power Co. v. Eshleman,* 167 Cal. 666; *McCullagh v. Railroad Comm.,* 190 Cal. 13. In *Terminal Taxicab Co. v. Kutz,* 241 U. S. 252, the court said on this question: ''The important thing is what it does, not what its charter says.'' To the same effect is *United States v. Brooklyn Eastern Dist. Terminal,* 249 U. S. 296.

The evidence does not support the theory that the two companies were identical or sustained the relation of principal and agent. The origin of the two companies indicates an entirely separate and distinct history. More than 12 years before the mortgage was made the storage company, under the name of Purakwa Ice Company, was organized. This name was later changed to the Calumet Refrigerating Company, which first engaged in the cold storage business two years before the mortgage was made. Neither corporation owned any stock in the other. We have already indicated how the businesses were carried on separately and distinctly one from the other. The general rule of corporate entity is that, since a corporation is a person distinct from its members or stockholders, even

though the same individuals may be the incorporators, officers or stockholders in the two corporations, there is no identity between them and neither is liable for the acts of the other merely because of the identity of the stockholders and officers. 14 C. J. 58, sec. 19; *Pittsburgh & Buffalo Co. v. Duncan,* 232 Fed. 584; *In re Watertown Paper Co.,* 169 Fed. 252; *Peckett v. Wood,* 234 Fed. 833; *Martin v. Development Co. of America,* 240 Fed. 42. In *State Public Utilities Comm. v. Romberg,* 275 Ill. 432, the decision was based upon this same rule, holding that the purchase by one company of a majority of the shares of stock of another company does not divest the selling company of its franchise.

There are doubtless many cases in which, for the purpose of doing justice and to prevent a wrong, courts of equity will negative the legal conception of an independent corporate entity. But it is quite a different thing to sweep away the corporate entity of the two instant corporations for the purpose of avoiding the paying of an honest debt. It would be unconscionable to do this for the purpose of nullifying an obligation of the defendants and unjustly to enrich them at the expense of complainants who made the loan and against whom no charge of unfairness in that connection is made.

We hold that the report of the master and the decree of the chancellor were proper on this point, and that the Calumet Company, the mortgagor, at the time it made the instant loan and trust deed, was not a public utility within the meaning of the statute, and that the mortgage was valid.

Another reason which, in equity, should bar the defendants from asserting that the mortgage is void is found in subsequent proceedings to which we shall refer only briefly. Matheus Gottfried, who organized the Brewing company, was the owner of practically all

of its stock. In 1891, he sold the stock to his son, Carl M. Gottfried, and his son-in-law, John H. Weiss. Matheus Gottfried died November 3, 1902. In 1923, which was some time after the instant loan was made, dissension arose between the descendants of Matheus Gottfried, and one of the factors was that, as an additional security to the instant loan, Carl M. Gottfried and John H. Weiss had personally guaranteed the bonds. The dissension terminated in what is called a "Family Settlement," which upon petition filed in the superior court was confirmed. The gist of this settlement was that all parties agreed that the properties dealt with, being the premises involved here, were owned by the Brewing company, which in turn was owned by Carl M. Gottfried and the Weiss estate (John H. Weiss having died in the meantime.) Gottfried and Weiss, who were personally liable for the debt by reason of their guaranty indorsed on each bond, refused to part with the equity of the premises and still remain burdened with that personal liability, and insisted that the others should specifically agree to make the land primarily liable for the debt. All the parties agreed that the premises were to be treated as equitably liable for their debts, and in return for this Gottfried and Weiss were to cause said property to be conveyed to a trustee, expressly subject to the lien of the instant trust deed, which all parties stipulated and agreed was a valid and subsisting lien upon the premises. The trustee was to use the rents and income for specified purposes, including the payment of interest and the sinking fund payments provided for by the trust deed, and eventually to sell the premises unless the mortgagee consented otherwise, and to distribute the proceeds among the beneficial owners, the defendants here. These matters were evidenced by a number of written documents, by the petition filed in the superior court and the decree which was entered. In each

and all of these documents the validity and priority lien of the instant trust deed was asserted and taken into account in the settlement.

Counsel for defendants argues that these transactions do not operate as an estoppel because the parties concerned did not know at the time that the mortgage was void. On general equitable principles, the beneficial owners of the equity, after they have recognized and, in the family settlement provided for, the lien of the trust deed, should not now be heard to question its validity. The property conveyed has been in the family for more than forty years; they knew of the mortgage lien and knew that the money obtained on the loan had been expended in repairing and altering the property; they approved the making of the loan while holding stock in the mortgagor company; they were not deceived in any way. As was said in *Daub v. Englebach,* 109 Ill. 267, it would be inequitable and unjust to permit one who purchases land subject to the mortgage to escape payment, the court saying: ''Even if the mortgage was rendered void, he, in equity, is still liable to pay the debt . . . and even if the mortgage was rendered void, that did not cancel the debt, nor did it release him from his legal liability to pay it.'' See also *Sidwell v. Wheaton,* 114 Ill. 267; *Henderson v. Bellew,* 45 Ill. 322; *United States Bond & Mtg. Co. v. Keahey,* 53 Okla. 176, 155 Pac. 557; Jones on Mortgages, 7th ed., vol. II, p. 155; Pomeroy on Equity Jurisprudence, 4th ed., vol. III, sec. 1205; Tiffany on Real Property, 2nd ed., vol. III, p. 2572. In this last work the author says, in substance, that, where one takes property subject to a supposed mortgage, he cannot thereafter assert, as against one seeking to enforce such supposed mortgage, that it has no legal existence.

Complainants' counsel present another reason why the claim of defendants that the mortgage was void

cannot prevail. They assert that at the time the mortgage was made cold storage warehouses were not subject to the provisions of the Public Utilities Act, Cahill's St. ch. 111a, because they had been withdrawn from its scope by the Uniform Cold Storage Act of June 28, 1917, Cahill's St. ch. 56b, ¶ 119 *et seq.*, and therefore the consent of the public utilities commission to the making of the instant mortgage was not required. We do no more than state this point without deciding it. We prefer to rest our decision upon the reasons we have just discussed. They seem to us so conclusive against the position of defendants as to make it unnecessary to express any opinion on this last point.

Complainants are seeking a partial foreclosure and defendants say they cannot have this. The notes secured by the mortgage fell due July 1 in annual instalments of $25,000 each, except the last, which was $50,000, making an aggregate of $250,000. Complainants filed their bill as the holder of bonds with interest maturing July 1, 1920, to July 1, 1924, inclusive. Defendants deny complainants' right to bring foreclosure for this partial indebtedness by reason of a provision of the trust deed, as follows:

"All of said bonds and interest coupons attached thereto are equally and in all things secured by this Deed of Trust without any preference, priority or distinction whatsoever of the lien thereof, in favor of any one or more of said bonds or coupons over any one or more of the others, by reason of prior maturity thereof, or for any other reason whatsoever."

The bill asked that complainants' lien be subordinated to the remainder of the indebtedness and the decree so found. It is argued that the provision just quoted forbids changing the priority of liens in favor of any one or more of said bonds. Cases are cited to the effect that the stipulations in the mortgage or trust

deed are binding and may not be changed. A typical case is *Schultz v. Plankinton Bank,* 141 Ill. 116, in which it was sought to have one of a series of notes, which note alone was guaranteed by the son of the maker, and the others not, paid first out of the proceeds of the sale of the property and before the other notes which matured prior thereto. It was sought to introduce a parol agreement that this should be done. The opinion held that the parol agreement was not admissible to modify the provisions of the mortgage. Manifestly, the alleged parol agreement was to extinguish the obligation of the son as guarantor to the detriment of the holders of the prior maturing notes. We do not view *Walker v. Dement,* 42 Ill. 272, as holding that the holder of a series of notes secured by mortgage may not by agreement with the assignee of some of this series subsequently maturing waive the right to a prior lien of the notes he retains and give the assignee the prior lien for his notes. Indeed, the opinion states clearly that this may be done.

Partial foreclosure in this state has been approved frequently by the courts. In *Boyer v. Chandler,* 160 Ill. 394, it was said: ''The holder of a note due is not required to wait until the other notes secured by the same mortgage are due before he takes steps to enforce his security.'' This has been repeated in *Chicago Title & Trust Co. v. Prendergast,* 335 Ill. 646, where it is said that the effect of the partial foreclosure is to withdraw from the lien of the trust deed the notes of the complainant and to make the trust deed a security only for the remaining outstanding notes, citing *Northern Trust Co. v. Sanford,* 308 Ill. 381; *Morgernstern v. Klees,* 30 Ill. 422. The instant proceedings followed closely the proceedings approved in *Boyer v. Chandler,* 160 Ill. 394, and *Chicago Title & Trust Co. v. Prendergast,* 335 Ill. 646. Complainants seek no relief which might injuriously affect the holders of the bonds not

due. Rather the course adopted was beneficial as to them. These cases also hold that the holders of the other notes are not necessarily parties to the bill and that the complainants had a clear right to take a decree to sell the mortgaged premises subject to the balance due or to become due and were not bound to declare the whole debt due. We cannot see how the defendants, the owners of the equity, are injured in any way. It does not increase their indebtedness nor affect their rights.

It is earnestly argued that the bonds, the subject of the foreclosure, have been paid over the counter of the complainants. This depends upon the facts. On June 29, 1921, Carl M. Gottfried, president, and John H. Weiss, vice president of the Calumet Company, called upon M. E. Greenebaum, president of Greenebaum Sons Bank & Trust Company, and stated that the Calumet Company would be unable to pay the bonds amounting to $25,000, which matured July 1, 1921. Thereupon by agreement the Calumet Company gave to the bank its note for $25,000, dated June 29, 1921, and at the same time executed its written agreement pledging the bonds maturing July 1 to the bank as collateral security for the payment of said note. The $25,000 represented by the note was credited on the books of the bank to the Calumet Company in an account entitled "Deposits for Matured Bonds and Coupons." The Calumet Company could not draw this money out or otherwise handle it. All the bonds of the series had theretofore been sold by the bank to its customers, and when the holders of the bonds maturing July 1, 1921, presented the same for payment they were taken up by the bank with funds out of this account and have ever since been held by the bank.

It should be stated that the original loan was negotiated with the Greenebaum Sons Bank & Trust Company, Trustee, which subsequently conveyed all of its

funds and assets to the Greenebaum Sons Investment Company, an Illinois corporation, one of the complainants.

A similar arrangement was made with reference to the bonds with interest maturing July 1, 1922, and also with reference to the bonds and interest maturing July 1, 1923. All of these bonds went into the hands of the Greenebaum Sons Investment Company. A like arrangement was made with reference to the interest maturing January 1, 1924. The bonds due July 1, 1924, amounting to $25,000 with interest were paid by the Investment Company in order to protect its existing lien. The bill was filed November 16, 1924, and the Investment Company took up the coupons falling due January 1, 1925, and the bonds and coupons falling due July 1, 1926, the interest coupons falling due January 1, 1926, and the bonds with interest falling due July 1, 1926. Greenebaum Sons Investment Company thereby obtained a lien under said trust deed subordinate to the lien of all other outstanding bonds and interest for the amount due on the notes of the Calumet Company held by it and offered in evidence. Defendants assert that these transactions amounted to payment. Complainants reply that there was a conventional subrogation by which the Bank became the owner of the bonds as a pledgee and of all the bonds and interest which it took over.

A conventional subrogation has been defined as a transaction in which one who by agreement pays off the obligation of another secured by mortgage or advances money for its payment at the instance of the debtor and for his benefit is entitled to be subrogated to the rights of the original creditor. This doctrine has been recognized and stated in many cases. In *Home Savings Bank v. Bierstadt,* 168 Ill. 618, there was an agreement made between the debtor and a third person that such person was to advance money to take up the amounts due on a number of trust deeds and

the third person was to have a mortgage for the sum advanced on the property covered by the trust deeds, and thereupon the amounts due on the trust deeds were paid and a new trust deed was made to secure the indebtedness which had been advanced. There was a second trust deed on the property. A bill was filed to foreclose the new trust deed, praying that the complainant be subrogated to the lien of the trust deeds which had been paid and released. The court granted this, saying that it amounted to a conventional subrogation "which results from express agreement with the debtor, by which one advances money to pay a claim, for the security of which there exists a lien." To the same effect are *In re McGuire,* 137 Fed. 967; *American Trust & Savings Bank v. Turner* (Ala.), 80 So. 176. In this latter case it was said:

"It is not essential to conventional subrogation that the creditor should be a party to the agreement between the debtor and a third party, and the contract supporting the subrogation may be between the party to be subrogated and either the creditor or the debtor."

Similar facts were involved in *Thomas v. Hall,* 116 Me. 140, 100 Atl. 502, where the court held that a stranger may be subrogated to the interests of a mortgagee as against a subsequent mortgagee or purchaser, by force of an agreement made by a mortgagor at the time of paying the mortgage debt, citing Jones on Mortgages, section 874-A. See also *Loewenthal v. McCormick,* 101 Ill. 143.

The rule that subrogation can be enforced only when the whole debt is paid is for the protection of the holder of that part of the debt not paid, and we cannot see that defendants are interested. Inasmuch as the decree subordinates the rights of complainants to the lien of the subsequently maturing bonds, complainants have, in effect, a second mortgage and can enforce it in any way which the law allows, provided that such enforcement does not affect the rights of the holders

of the remaining outstanding bonds and coupons. This was recognized in *White v. Fisher*, 62 Ill. 258; *Skinkle v. Huffman*, 52 Neb. 20, 71 N. W. 1004; *Nettleton v. Ramsay County Land & Loan Co.*, 54 Minn. 395, 56 N. W. 128; *Marks v. Baum Building Co.* (Okla.), 175 Pac. 818; *New Jersey Building Loan & Investment Co. v. Cumberland Land & Improvement Co.*, 53 N. J. Eq. 644, 33 Atl. 964.

In *Illinois Nat. Bank v. School Trustees*, 211 Ill. 500, it was held that a junior incumbrancer, who in order to protect his own security is compelled to discharge a prior mortgage, will in equity become subrogated to the rights of the holder of the prior incumbrance and will be treated as a purchaser or assignee of the superior lien, unless the facts show it was intended as an absolute payment. To the same effect are *Lidster v. Poole*, 122 Ill. App. 227; *Gipps Brewing Co. v. Wasson*, 193 Ill. App. 158. The legislature in 1927 enacted this rule into a statute. (Cahill's St. ch. 95, ¶ 22 [1].) As the holder of the inferior lien which they were foreclosing, complainants had the right to protect that lien either by purchasing or paying off the bonds and interest coupons, as they matured, after the bill to foreclose was filed, and enforcing such payments by adding them to their inferior lien, which was done in this case.

Counsel for defendants make other points against this subrogation which, with the cases cited, we have considered, but we find nothing therein which defeats the substantial equity and justice of complainants' position.

When the decree was entered there were unpaid taxes amounting to about $200,000, and the chancellor was requested to require the proceeds of the sale to be applied first to the payment of these. This request was refused and the decree was entered directing that the entire proceeds of the sale be paid to complainants. *Wiswall v. Kunz*, 173 Ill. 110, cited by defendants, involved a personal property tax upon property

held by a receiver. It was there held that it was properly payable as part of the expense of the receivership. In *Jack v. Weinnett,* 115 Ill. 105, an assignee for the benefit of creditors was required to pay personal property taxes out of funds in his hands. These are not decisive of the instant question.

Taxes on real property are a first and prior lien superior to all other liens and one buying at a judicial sale takes subject to such prior lien. It was held in *Whitaker v. Irons,* 300 Ill. 254, that upon a bill to foreclose a mortgage subject to a concededly prior lien, it was not necessary to make the holder of the prior claim a party, and the prior claim was not a proper subject of consideration in a foreclosure suit. This, by analogy, would apply to the question of taxes. Furthermore, defendants are not entitled to have the taxes paid out of the proceeds of the sale. Their only right is to redeem from the decree or sale had thereunder. If the taxes should be paid out of the proceeds of the sale and the defendants should redeem, they would have to include the amount of such taxes in their redemption payment; and if the taxes are not paid, they will take the land upon redemption subject to such taxes and will have to pay such taxes to protect their property. It makes no difference to them if they pay the taxes upon redemption or after redemption. We do not see that the defendants' rights are involved upon this point.

We repeat, we have not attempted to reply to all the points made by defendants' very able counsel. We have considered the case along the line of the patent equities presented by the record and which are with the complainants and supported by a large number of decisions. No sufficient reason appears which requires us to reverse the decree. It is therefore affirmed.

*Affirmed.*

Matchett, P. J., and O'Connor, J., concur.