## Sayre Land Company, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued September 13, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

418

Before Sohn, J.

*James H. Booser,* with him *Harry H. Frank,* and *McNees, Wallace & Nurick,* for appellant.

*Edward Munce,* Assistant Counsel, with him *Joseph I. Lewis,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

Opinion by Ervin, J., November 16, 1961:

The single question in this appeal is whether the appellant, The Sayre Land Company, is a public utility subject to the Pennsylvania Public Utility Commission's regulatory functions.

By Complaint In Equity For a Final Injunction, filed June 28, 1954, The Sayre Land Company, a corporation of, and doing business in, the Commonwealth of Pennsylvania, hereinafter referred to as "Land Company," filed this complaint,[1] seeking a permanent in-

---

[1] This was the proper forum in which to proceed. On June 1, 1949 the Borough of Athens, at A 74405, and the Borough of Sayre, at A 74406, filed applications with the Commission, under §34, Clause 7 of the Incorporation Act of 1874, P. L. 73, 15 PS §1353, which provides: "It shall be lawful, at any time after twenty years from the introduction of water or gas, as the case may be, into any place as aforesaid, for the town, borough, city or district in which the said company shall be located, to become the owners of said works, and the property of said company, by paying therefor the net cost of erecting and maintaining the same, with interest there-

junction to compel the Pennsylvania Public Utility Commission, hereinafter referred to as the "Commission," to forthwith dismiss and discontinue all proceedings pending before it in complaints entitled "Borough of Sayre v. The Sayre Land Company" docketed at C. 15700,[2] and "Borough of Athens v. The Sayre Land Company," docketed at C. 15701,[2] and in an investiga-

on at the rate of ten per centum per annum, deducting from said interest all dividends theretofore declared."

On September 22, 1949 the boroughs filed with the Commission identical petitions for access to the books, records and property of Land Company in order that they might secure the data required to compute the purchase price to be paid. Land Company filed motions to dismiss these petitions. The Commission dismissed Land Company's motions and ordered Land Company to permit access to its books. Land Company appealed and we quashed the appeals as interlocutory. See *Sayre Land Co. v. Pa. P. U. C.*, 167 Pa. Superior Ct. 1, 74 A. 2d 713. At page 8 of the opinion will be found the following: ". . . in cases where the Commission does not dismiss for lack of jurisdiction, but persists in entertaining jurisdiction, a person desiring to question the jurisdiction of the Commission over the parties or the subject matter may do so by applying for an injunction against the Commission in the Court of Common Pleas of Dauphin County. This statutory method for deciding the question in limine, said Mr. Justice SIMPSON, is similar to the remedy provided by the Act of March 5, 1925, P. L. 23, 12 PS §672 (superseded by Rule 1017 of the Pennsylvania Rules of Civil Procedure) permitting jurisdictional questions to be raised in limine in ordinary actions at law or in equity. It would appear, therefore, that in cases like the present where the Commission 'persists in entertaining jurisdiction' the statutory remedy given in section 1111 of the Act, 66 PS §1441, by injunction is an exclusive remedy. Where a remedy or method of procedure is provided by an act, its provisions must be strictly pursued and exclusively applied. Act of March 21, 1806, P. L. 558, 4 Sm. L. 326, §13, 46 PS §156; . . . ."

[2] These were two separate complaint proceedings, before the Commission, filed by the Boroughs of Sayre and Athens on or about April 24, 1952 alleging in substance that the Land Company is a public utility by virtue of its ownership of factilities used in public service, and then alleged violations of the Publc Utility Law. These proceedings have not been completed.

tion upon Commission motion entitled "Pennsylvania Public Utility Commission v. The Sayre Land Company," docketed at C. 13907-43.[3] The answer of the Commission was filed July 19, 1954. A reply was filed by the Land Company on August 13, 1954.

On January 28, 1960 the court below filed a final decree dismissing the Land Company's bill. Land Company appealed. The court below found that Land Company was a public utility as defined in the Public Utility Law and it follows, of course, that as such Land Company would be subject to all of the laws and regulations governing public utilities.

Substantially all of the facts involved in this controversy appear in the 77 findings of fact made by the court below.

In the years 1870 and 1871, Howard Elmer and Charles F. Anthony and two associates purchased 738 acres of land lying in Athens Township between the Villages of Waverly and Athens in Bradford County, Pennsylvania, and in the latter year laid out the plans and streets of the Village of Sayre and began the erection of commercial and residential buildings. In 1878 R. A. Packer, H. E. Packer, Elisha P. Wilbur and Robert Lockhart purchased a one-half interest in this development from the executors of the estate of Charles F. Anthony. On May 23, 1879, under the provisions of the Act of April 29, 1874, P. L. 73, The Sayre Land Company was incorporated "for the purpose of purchasing and improving real estate and selling the same in lots or parcels."

---

[3] This was a proceeding instituted by the Commission upon its own motion March 29, 1943, to determine "(1) Whether The Sayre Land Company is a public utility as defined by the Public Utility Law; and (2) whether The Sayre Land Company is subject to the Commission's jurisdiction." This proceeding has not been completed.

On August 25, 1881, the Sayre Water Company was incorporated under the provisions of the above mentioned Act of Assembly "for the purpose of supplying water to the public of the Villages of Sayre, Athens and vicinity in the Township of Athens, Bradford County." In furtherance of the real estate development and improvement, Land Company constructed a waterworks and water supply system, together with buildings, fixtures, appurtenances and equipment necessary for the development and improvement of the above mentioned real estate. On May 27, 1885 Land Company executed what the appellant terms a lease and which the appellee terms an agreement, for use by Water Company of the waterworks properties owned by Land Company.[4]

---

[4] "THIS INDENTURE made this twenty-seventh day of May A.D., one thousand eight hundred and eighty-five (1885) between The Sayre Land Company, of the first part (hereinafter called the Lessor), and The Sayre Water Company, of the second part (hereinafter called the Lessee).

"WITNESSETH: Whereas The Sayre Land Company has for the purpose of improving its property at Sayre, Penna., constructed at its own cost a Reservoir and Water Works, and has laid in the Village of Sayre and its vicinity large quantities of water pipe connecting with said Reservoir and Water Works, and has expended large sums of money in the erection of said improvements, and is desirous of leasing the same to The Sayre Water Company.

"And Whereas, at a special meeting of the stockholders of The Sayre Land Company, duly called and held at the office of the said Company at Sayre, Pennsylvania on May 1st 1885, at which all the stockholders of said Company were represented in person or by proxy, the question of leasing to The Sayre Water Company the said Reservoir and the Works connected therewith, was referred to the Board of Directors of the Sayre Land Company with full power to take action thereon at any time, and to determine the terms and conditions of such leasing:

"And Whereas, at a meeting of the Directors of The Sayre Land Company duly called and held at Sayre, Pennsylvania, May twenty-seventh 1885, the following resolution was adopted:

"Resolved, That this Company execute and deliver to The Sayre Water Company a lease of the lot known as the Hulett lot

on which the Reservoir built and owned by this Company is situated together with said Reservoir, also the entire Water Works, mains, pipes, fixtures and appurtenances connected therewith, constructed, erected, and laid by this Company in the Township of Athens, at an annual rental of Five Thousand Dollars for the period or term of one year and thereafter from year to year until either party shall give the other three months written notice of. a desire to terminate the said lease; the said lease to be in form following which is hereby approved and adopted, and the President and Secretary are hereby authorized and directed to execute and deliver the said lease to The Sayre Water Company.

"And Whereas at the Annual meeting of The Sayre Water Company, held at Sayre, Penna., on May twenty-seventh, 1885, the following preamble and resolution was adopted:

"Whereas, The Sayre Land Company has offered to lease to The Sayre Water Company the lot known as the Hulett lot on which the Reservoir built and owned by The Sayre Land Company is situated together with said Reservoir also the entire Water Works, mains, pipes, fixtures and appurtenances connected therewith, constructed, erected and laid by The Sayre Land Company in the Township of Athens, at an annual rental of Five Thousand Dollars, for the period or term of one year, and thereafter from year to year until either party shall give to the other three months Written notice of a desire to terminate the said lease:

"Resolved that the lease as aforesaid be accepted by this Company in said form and on such terms as the Directors may approve and adopt.

"And Whereas, at a meeting of the Directors of The Sayre Water Company held at Sayre, Pa., on the twenty-seventh day of May 1885 the following resolution was adopted:

"Resolved that this Company accept a lease from The Sayre Land Company of the lot known as the Hulett lot on which the Reservoir built and owned by The Sayre Land Company is situated together with said Reservoir also the entire Water Works, mains, pipes, fixtures and appurtenances connected therewith, constructed and erected, and laid by The Sayre Land Company in the Township of Athens, at an annual rental of Five Thousand Dollars for the period or term of one year and thereafter from year to year until either party shall give to the other three months written notice of a desire to terminate the said lease, the said lease to be in form following which is hereby approved and adopted, and the President and Secretary are hereby authorized and directed to execute and accept the same from The Sayre Land Company.

"And Whereas the form of this present lease was the form so as aforesaid approved and adopted at the said meeting of the Directors of The Sayre Land Company and of The Sayre Water Company (all of which by reference to the minutes of the said meetings will fully appear).

"Now This Indenture Witnesseth,

"That the Lessor for and in consideration of the premises and of the rents reserved, and of the covenants and agreements on the part of the Lessee, to be by it kept and performed as hereinafter set forth, hath granted, demised, hired and let, and by these presents does grant, demise, hire and let unto the said Lessee:

"All that certain tract of land situate in Athens Township, Bradford County, Pennsylvania, East of the Susquehanna River, known as the Hulett lot, on which the Reservoir built and owned by the Lessor is situated and bounded and described as follows:

"Beginning at a point on the South East Bank of the North East Branch of the Susquehanna River in the Township of Athens aforesaid, being the North West Corner of lands now or late of Marie Van Gorder; thence North eleven degrees East, six hundred and twenty-seven feet; thence North twenty-five degrees East two hundred and twenty-seven and eight tenths feet to the South West corner of land now or late of Joel Hulett; thence south eighty-eight degrees thirty minutes East, nine hundred and forty-three and eight tenths feet to a point in the division line between lands now or late of Joel Hulett, and lands now or late of C. S. Wheaton; thence along said division line South one degree thirty minutes West, six hundred and fifteen and four tenths feet; thence South sixty-three degrees thirty minutes West, one hundred and forty-eight feet to a pine sapling; thence South eighty-three degrees thirty minutes West, two hundred and thirty-nine and two tenths feet to a pine sapling; thence South sixty-four degrees West, two hundred and twenty-one and one tenth feet to a pine sapling; thence South sixty-one degrees fifteen minutes West one hundred and thirty-two feet to a walnut stump; thence South seventy-seven degrees forty-five minutes West two hundred and two and nine tenths feet to a Walnut; thence North seventy-one degrees fifteen minutes West three hundred and three-tenths feet to place of beginning;—Containing nineteen and eighty-two one hundredths acres more or less:—Being the same premises which Howard Elmer and wife by Indenture dated the 16th day of February A.D. 1885, Recorded in the office for Recording Deeds, in and for Bradford County, in Deed Book 160, page 117, granted and conveyed unto

the said The Sayre Land Company in fee. Also the said Reservoir and the entire Water Works, water mains, connections and pipes, constructed erected, placed and owned by the Lessor, in the Village of Sayre and the Borough of Athens and Vicinity, Together with Rights of Way, Engine and Boiler Houses, Engines, Boilers and Pumps, Tools, and all Structures and Devises appurtenant and connected with said Reservoir and Water Works, and the appurtenances whatsoever, To Have and To Hold the Premises, Works and Appurtenances leased and demised as aforesaid unto the said Lessee, its successors and assigns, for the term of one year from and including the First day of June A. D. eighteen hundred and eighty-five (1885) to the first day of June A.D. eighteen hundred and eighty-six (1886), under and subject nevertheless to the payment of a certain mortgage debt of Seventy-five Thousand Dollars, secured on inter alia said above described lot and appurtenances, by Indenture of Mortgage given and executed by the said The Sayre Land Company to The Girard Life Insurance Annuity and Trust Company of Philadelphia, dated the first day of May A.D. 1885 and recorded in the office for Recording Deeds etc., in and for Bradford County in Mortgage Book 21 page 548. Yielding and Paying therefor and thereout the yearly rent of Five Thousand Dollars (5000.00) in even and equal quarterly payments the first payment therefor to be made on the First day of September A.D. eighteen hundred and eighty-five (1885). And in consideration of the premises the said Lessee has covenanted and agreed and does hereby for itself, its successors and assigns covenant and agree to and with the said Lessor, as follows:

"First: The Lessee shall and will punctually pay to the Lessor the rent hereby reserved on the days and times hereinabove mentioned.

"Second: The Lessee shall and will at all times during the continuance of this lease keep and maintain and at the expiration of the term peaceably· deliver up the hereby demised lands, Reservoir and property real and personal, in as good order and condition as the same now are.

"Third: The Lessee shall and will punctually pay and satisfy all taxes, charges and assessments of any and every kind, which, during the continuance of the term hereof shall be assessed or imposed under any existing or future laws upon the said premises or property real and personal or any part thereof or upon the fixtures, building or improvements, now or hereafter erected thereon, or upon the business to be carried on by said Lessee, on, about or in connection with the same.

"Fourth: The Lessee shall and will not assign, sublet or mortgage the premises and property real and personal hereby demised, or any part thereof, or the unexpired term of the Lease, without the consent in writing of the Lessor first had and obtained.

"Fifth: The Lessee shall from time to time and at all times during the continuance of this Lease, indemnify and save harmless the Lessor from all liabilities, claims suits, costs, damages and expenses resulting from or occasioned by any act or omission of the Lessee in the use, management and control of the hereinbefore demised premises and property in the business of the Lessee connected therewith, or from any failure or neglect of the Lessee to comply with the covenants, stipulations and conditions herein contained.

"Sixth: The Lessee agrees to procure the owners of its Capital stock to deposit with and transfer to the Lessor (or at the option of the Lessor to some person or persons to be designated by the Lessor) all of the stock of the said The Sayre Water Company, as collateral security for the faithful performance of all the terms, covenants, conditions and obligations of the Lessee under this Lease, and the Lessor shall and will give or cause to be given to the Stockholders who shall have transferred their stock as aforesaid, all necessary proxies to enable them to vote at all annual or other meetings and elections while said stock may be so held as collateral. And the Lessee further commands that during the continuance of this Lease it will not issue any additional stock without the consent of the Lessor had and obtained.

"Seventh: If the Lessee shall make default in any quarterly payment of rent as aforesaid, or in the payment of any tax which may be levied as aforesaid when and as the same shall be due and payable, or shall not keep and perform, or shall violate any of the covenants, agreements, conditions and obligations, or shall fail to observe all the terms, provisions and instructions of this agreement, on its part to be kept, performed and observed, or shall suffer any mechanics lien to be entered against the property hereby demised, or against buildings or machinery, now or hereafter erected thereon, or in connection therewith, or execute any mortgage therefor, or of the term of this Lease, or make any assignment for the benefit of creditors or composition therewith which shall include such property as shall suffer any judgment to be entered against it beyond what its other property is amply sufficient to secure and pay, or if by reason of insolvency, bankruptcy or otherwise the Lessee shall be unable to fulfill the covenants herein contained fully and effectively according to the true intent and meaning therefor, or shall do any other act with intent to convey in any manner to any

person or persons, corporation or corporations, the partial or entire ownership or control of the said leasehold estate, or the improvements, fixtures, or moveables connected therewith, or used thereon, without the consent of the lessor in writing first had and obtained, then and from thenceforth in any or either of such cases it shall and may be lawful for the said Lessor to give written notice to the said Lessee that it annuls and makes void, and the Lessor may enter and seize and take possession for its own use of the said premises, and of all and singular and said improvements, reservoir, building, machinery, engines, mains, pipes, fixtures and all other property hereby demised wherever situate, anything herein contained to the contrary thereof notwithstanding and any attorney at the mere request of the Lessor and without any liability for his so doing may immediately thereafter as attorney for the Lessee sign an agreement for entering in any proper court an amicable action of ejectment and judgment thereon, without any stay of execution, against the Lessee, its successors and assigns and all persons claiming under it or them for the recovery by the Lessor of the Possession of the premises and property aforesaid for which this agreement shall be a sufficient warrant; and thereupon a writ of habere facias possessionem may issue forthwith without any prior writ or proceeding whatever upon the said judgment, and the Lessee hereby releases the Lessor from all errors and defects whatsoever in entering such action and judgment and causing such writ of Habere facias possessionem to be issued, and in any proceeding thereon or concerning the same, and hereby agrees that no writ of error or exception or objection shall be taken or made thereto; it being understood and agreed that no determination of this agreement or taking or recovering possession of the said premises and property shall deprive the Lessor of any action or remedy against the Lessee for any damage for breach of any covenant, promise or agreement by it in this agreement entered into or made, or for any rent or sum of money that may be due and unpaid.

"Eighth: If the said Lessee shall with the consent of the Lessor assign, sublet or mortgage this agreement the assignee or assignees, sub-lease or sub-lessees, mortgagee or mortgagees, or the purchaser under any sale had under such mortgage, in any or either case shall take and hold the estate hereby demised subject to all the terms and conditions of this agreement and shall not assign, sub-let or mortgage the said agreement without the license and consent of the Lessor for that purpose in writing first had and obtained.

"Ninth: Either party may determine this Lease at the end of the said term by giving notice to the other at least three months

On May 28, 1896 the Land Company and Water Company entered into a written agreement modifying the rental to be paid under the above mentioned instrument.[5]

---

prior thereto of such determination; but in the absence of such notice this lease shall continue upon the same terms and conditions as are herein contained for a further period of one year, and so on from year to year, unless or until terminated by either party by notice as aforesaid at least three months prior to the expiration of the then current year.

"Tenth: All rights and liabilities herein given to or imposed upon either of the parties hereto shall extend to the successors and assigns of such party.

"In Witness Whereof, the said The Sayre Land Company and the said The Sayre Water Company have caused their corporate seals, duly attested, to be hereunto affixed the day and year first above written.

"Signed, sealed and delivered in the presence of

Attest   W. Stevenson,
      Secretary

        The Sayre Land Company
        By   Howard Elmer, Pres.

        The Sayre Water Company
        By   Howard Elmer, Pres."

[5] "THIS AGREEMENT made the 28th day of May A. D. One Thousan Eight Hundred and Ninety-six (1896) between THE SAYRE LAND COMPANY of the first part (hereinafter called the Lessor) and THE SAYRE WATER COMPANY of the second part (hereinafter called the Lessee).

"WHEREAS the Lessor by Indenture of Lease dated the 27th day of May 1885 let to the Lessee a tract of land situated in Athens Township, Bradford County, Pennsylvania, known as the Hulett lot with the reservoir thereon constructed, and certain other property in the said lease mentioned and described for a term of one year and thereafter from year to year until terminated by notice as therein provided, at a yearly rental of Five Thousand Dollars ($5,000.00) which said lease has continued in force between the parties.

"AND WHEREAS the rental aforesaid has been found to be insufficient return to the Lessor for the premises and property so

The court below specifically found: "That under the terms of the instrument the Water Company must, and in fact does: (1) keep and maintain the property in good order and condition; (2) punctually pay and satisfy all taxes, charges and assessments upon the property or upon the business carried on by the Water Company; and (3) indemnify and save harmless the Land Company from all liabilities, claims, suits, costs,

---

leased and the parties hereto have by authority of their respective Boards of Directors agreed to an increase of rental.

"Now This Agreement Witnesseth, that the lease above recited shall be modified as follows:

"The yearly rent reserved, and which the lessee agrees to pay to the lessor, shall be from the 1st day of May 1896 the entire earnings of the lessee remaining after payment of the cost of repairs and maintenance of and taxes, charges, and assessments on the demised premises, and of all its current expenses, excepting so much of its earnings as shall equal six per cent on the par value of its Capital Stock, which amount it shall retain in its own hands.

"The lease aforesaid shall continue in full force and effect in all respects except as hereby modified.

"In Witness Whereof the parties hereto have caused their respective corporate seals to be hereunto affixed, duly attested, the day and year first above written.

The Sayre Land Company

By    Rob't Lockhart

President

Attest:

E. P. Wilbur, Jr.
Secretary

(Seal)

The Sayre Land Company

The Sayre Water Company

By    Robert Lockhart

President

(Seal)

The Sayre Water Co.

Attest:

E. P. Wilbur, Jr.
Secretary"

damages and expenses resulting from or occasioned by any act or omission of the Water Company in the use, management and control of the premises and property or the business of the Water Company.

"(a) The Sayre Water Company has in the past and does presently comply with these provisions of the instrument between The Sayre Land Company and The Sayre Water Company.

"(b) The Sayre Land Company performs none of the duties imposed upon The Sayre Water Company by the terms of said instrument."

The Water Company also has been and is now operating the water supply property and rendering the service of supplying the public with water for compensation. It is and has also been making, demanding and receiving all rates or other compensation from the public for the water supplied. Eighty per cent to ninety per cent of the original cost of plant facilities used and useful in rendering water service to the public for compensation is owned by Land Company but leased to Water Company. The extensions of and additions to facilities which are necessary to convey water up to and including the curb well and curb cock have in the past been made and are presently made by the Land Company and have been and are presently paid for by Land Company and have been and are presently owned by Land Company.

The following officers and directors of the two companies are identical. These include the following: George M. West, director of both the Water Company and the Land Company and president of both Water Company and Land Company; Howard E. Bishop, director of both Water Company and Land Company and vice-president of both Water Company and Land Company; Eldridge P. Wilbur, director of both Water Company and Land Company and second vice-president of both Water Company and Land Company; David C.

Meyer, director of both Water Company and Land Company, general manager of both companies, secretary of both companies, and treasurer of both companies; Albert E. Theetge, director of both Water Company and Land Company and assistant treasurer of both Water Company and Land Company.

The five individuals above mentioned own stock in both companies but own less than $\frac{1}{2}$ of the shares of Water Company and own $12\frac{1}{2}$ per cent of the shares of Land Company. The offices of both companies are located in the same building in Sayre and the stockholders and directors of each company meet there on the same date but at a different hour.

The two companies share the services of some employees but such individuals are paid separately by each company for the work performed for that company.

The great majority of stockholders in Land Company are not stockholders in Water Company. Water Company owns no stock of Land Company and Land Company owns no stock of Water Company.

Water Company has a general manager and a number of persons are employed solely by it. These employees include a chemist, office clerk, a number of meter readers, two meter repairmen and two pumping station operators. It keeps its own books and records and issues its own annual reports. It pays its own capital stock tax and its own corporate net income tax. It owns and maintains the equipment, meters, fixtures, trucks, tools and office equipment used in operating the waterworks and furnishing water to the public. It maintains all property used in its business, including the property leased from Land Company, and pays all taxes thereon. It has possession and control of the water property. It receives and decides on applications for extension of service. It pays the operating and general expenses in connection with the operating

and maintaining of all the water properties used in supplying water to the public. It bills consumers and receives payment for water furnished in accordance with tariffs it regularly files with the Commission at rates determined by Water Company subject to Commission approval. Water Company has at all times operated said water supply property. Land Company has never operated the water supply property.

Water Company has at all times been subject to the jurisdiction and regulation of the Pennsylvania Public Utility Commission and its predecessor, Public Service Commission. It pays annual assessments for the operation and expenses of the Commission. It files the annual reports required of public utilities; it regularly files tariffs for water service. The Commission has fully determined the reasonableness of the rates of Water Company. Land Company has not considered itself a public utility and has filed no tariffs or annual reports and has paid no Commission assessments.

Water Company has at all times been in full compliance with the regulations and orders of the Commission. There is no evidence and there is no finding of fact establishing any inadequacy of service or any service complaints nor is there any contention that the rates are too high.

The court below concluded that Land Company was a public utility because (1) it *owned* a substantial proportion of the plant and equipment used by Water Company and (2) that Land Company operated the plant and equipment through Water Company as its agent.

We will first consider the question of whether Land Company did own the plant and equipment within the meaning as expressed in the Public Utility Law of this Commonwealth.

Section 2(17) of the Public Utility Law, Act of May 28, 1937, P. L. 1053, 66 PS §1102(17), defines the term "public utility" as follows: "(17) 'Public Utility'

means persons or corporations now or hereafter owning or operating in this Commonwealth equipment, or facilities for: . . . (b) Diverting, developing, pumping, impounding, distributing, or furnishing water to or for the public for compensation; . . . ."

In §2(10) of the Public Utility Law, 66 PS §1102-(10), "facilities" is defined as follows: "(10) 'Facilities' means all the plant and equipment of a public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with, the business of any public utility: . . . ."

From the above it will be seen that the word "facilities" as used in §2(17) to describe the property to which the term "owning" refers, is fully defined in §2(10). The reasoning of the court below as to the word "owning" is found in the following language: "To follow the plaintiff's reasoning, we must overlook the significance of the change in approach by the legislature between the Public Service Company Law and the Public Utility Law. The former Act was the Act of July 26, 1913, P. L. 1374, while the latter Act is the Act of May 28, 1937, P. L. 1053. Clearly the latter act was passed to take the place of the former act. There is a vast difference in the definition of the term 'public utility,' in the two acts.

"In the Public Service Company Law, the legislature defined the term by stating in Section 1 that certain types of corporations—or persons engaged in certain types of businesses—were public service companies. The term was defined to include 'water corporations.' 'Owners' of public utility property were not included within the definition of the term 'public service company,' as found in the Public Service Company Law.

"In the Public Utility Law, however, the legislature broadened the definition to include not only corporations or persons engaged in certain types of activities as 'operators' but also corporations or persons owning facilities designated as used for certain purposes. Certainly the legislature intended to accomplish some legitimate objective in broadening the definition of the term 'public utility.' An examination of the cases cited before the passage of the Public Utility Law will clearly demonstrate that there was a vacuum or a hiatus so far as regulatory power existed under the former law so far as 'owners' of property were concerned. When the legislature passed the Public Utility Law, the gap in the law was filled."

The court below did not refer to any cases in connection with this subject. It has been given consideration by our own appellate courts.

In the case of *Citizens' Passenger Railway Co. v. Public Service Commission*, 75 Pa. Superior Ct. 238, the lessee, Philadelphia Rapid Transit Co., was the sole operating company in the City of Philadelphia. It had leased numerous street passenger railway companies originally operating under separate charters, each limited to a specific route of travel. While the Commission was investigating the service and fares of P.R.T., it received complaints that P.R.T. was unable to render adequate service at reasonable rates because, under the leases through which it obtained possession and control of the property it operated, P.R.T. was compelled to pay exorbitant rentals. The complainants asked the Commission to determine the fair value of the leased property, to fix fair rates, and, if necessary, to reduce the rentals provided in said leases. The lessors' demurrers to the complaints were overruled by the Commission and it directed lessors to file answers. In the demurrers the lessors had averred that the Commission did not have jurisdiction over them. The lessors

appealed and we reversed. In an opinion written by Judge HEAD, at p. 252, it is said: "If the commission may lawfully proceed to compel the present possessor of that property in lawful control of it, to respond to the just demands of the public, whence the necessity to go back along the chain of title and bring in, at the expenditure of much time, money and effort, every company which has previously owned or controlled the same property? The interest of the public, which the Public Service Law sought to maintain and uphold, was the right to have adequate transportation, at reasonable rates, over the lines in the City of Philadelphia devoted to the service, without regard to the question of the ultimate ownership of that property." The Supreme Court (while holding as a matter of procedure that the Commission had not entered a final, appealable order), agreed, 271 Pa. 39, 54, 114 A. 642, that "the main point in the case . . . was correctly decided by the Superior Court." At page 55, in an opinion written by Mr. Justice SIMPSON, it was said: "Hence where, as here, under legislative authority, such a corporation has transferred its franchises and assets and has ceased to function, the commission has no jurisdiction over it, since the company has no rates to make or collect, no service to render the public, and no facilities to furnish or extend. This conclusion alone defeats the intervening complaints before the commission, for they are directed against nonfunctioning corporations only. If it be true, as argued by appellants, that there is a residue of powers remaining in the underlying companies, notwithstanding the leases, doubtless the statute, if applicable, will be duly applied when, if ever, they attempt to exercise those powers; in these complaints nothing is alleged on this subject." The complainants, as appellants before the Supreme Court, had argued that "The public service they are rendering is the continued owning of the property devoted to public use." The

Commission in its brief also relied upon the term "owning" as conferring jurisdiction over the lessors. The paper book of the Commission specifically called to the attention of the Supreme Court that art. I, §1 of the Public Service Company Law, Act of 1913, P. L. 1374, at p. 1376, provides, inter alia: "The term 'Street Railway Corporation,' as used in this act, includes every corporation *owning*, leasing, operating, or managing or *controlling*, any street railway within this Commonwealth." (Emphasis supplied)

The Public Utility Law of 1937 broadened the definition of a public utility to include not only corporations or persons engaged in certain types of activity as "operators" but also persons or corporations *owning* facilities. The old Public Service Company Law of 1913, likewise, as related to street railway corporations, included corporations "owning . . . or controlling any street railway within this Commonwealth." It is clear from the *Citizens' Passenger Railway Co.* cases that both of our appellate courts have expressed the thought that the words "owner" or "owning" in the Public Utility Law do not automatically make the owner a public utility where the lessee of the owner is the actual operator of the facilities. The *Citizens' Passenger Railway Co.* case presents a stronger set of facts for the Commission's position than do the facts in the present case because in that case the lessors had been chartered, and for years had operated, as public service corporations, themselves devoting their property to a public service. In the present case the Land Company had never operated as a public service corporation nor had it directly devoted its property to a public service.

Other jurisdictions have wrestled with the problem we are here considering. In *Baltimore & Ohio Railroad Co. v. Walker*, 45 Ohio St. 577, 587, 16 N.E. 475, the Ohio legislation provided that " 'When the tracks of two railroads cross each other . . . the crossing shall

be made and kept in repair, and watchmen maintained thereat, at the joint expense of the companies owning the tracks. . . .'" In this case it was held that the lessee, as the owner for the time being, was the party responsible for performance of the duties enjoined by the legislation. In that case the Supreme Court of Ohio said: "Lessee companies having the possession and control of the roads, and operating them as such . . . are companies 'owning the tracks' of the roads operated by them, in the sense in which that phrase is used in the statute."

A similar result was arrived at in the case of *Proctor v. Hann. & St. Joe. R. R. Co.*, 64 Mo. 112, 124, where the court said: ". . . the owner for the time being, the corporation for the time being, operating, controlling, and managing the defective road. . . ." was responsible for carrying out the duties enjoined by the legislature. At p. 123 that court further said: "The word 'owner' in this section is used in the sense of proprietor, operator or owner at the time when the injury is received." See also *Stewart v. The Chicago and Northwestern R. R. Co.*, 27 Iowa 282, 285; *Illinois Central Railroad Co. v. Kanouse*, 39 Ill. 272, 278; *Indianapolis & St. Louis Railway Co. v. People*, 32 Ill. App. 286, 288; *State v. Corbett*, 57 Minn. 345, 353, 59 N.W. 317, 320; *Kentucky & Indiana Bridge Co. v. Louisville & Nashville Railroad Co.*, 37 F. 567, appeal dismissed by the Supreme Court in 149 U. S. 777, 13 S. Ct. 1048. In *Schott v. Harvey*, 105 Pa. 222, 228, Mr. Justice PAXSON said: ". . . a tenant in possession. For all practical purposes he is the owner until the end of his term . . . the reversioner . . . has practically parted with all control of the property . . . the owner at the time of the injury was contemplated without regard to the quantity or duration of his estate." In *New Street Bridge Co. v. P. S. C.*, 271 Pa. 19, 28, 114 A. 378, our Supreme Court said: "A lessee-operating company . . . owns for

a given time . . . property of . . . the lessor company.
. . ."

In *Chippewa Power Co. v. Railroad Commission,*
188 Wis. 246, 250, 205 N.W. 900, 902, where Wisconsin-
Minnesota Light & Power Co. had leased a dam at Jim
Falls and an electric transmission line constructed but
never operated by Chippewa Power Co., the lessor, the
term "own" in the Wisconsin Public Utility Law was
held inapplicable to a lessor as such, the Commission
was enjoined from exercising jurisdiction over lessor
as a public utility, and the Supreme Court of Wiscon-
sin ruled that "As long as the lessee performs the cove-
nants and conditions of the lease, it is, to all intents
and purposes, the owner of such plant. . . ."

In *Ellis v. Interstate Commerce Commission,* 237
U. S. 434, 443-444, 35 S. Ct. 645, 646, 647, the Supreme
Court of the United States, in an opinion delivered by
Mr. Justice Holmes, ruled that: "The Armour Car
Lines . . . owns . . . and . . . lets these cars to the rail-
road. . . . It is true that the definition of transporta-
tion in §1 of the act includes such instrumentalities
as the Armour Car Lines lets to the railroads. But
the definition is a preliminary to a requirement that
the carriers shall furnish them upon reasonable re-
quest, not that the owners and builders shall be re-
garded as carriers, contrary to the truth. The control
of the Commission over private cars, &c., is to be ef-
fected by its control over the railroads that are subject
to the act. . . . But the only relation that is subject to
the Commission is that between the railroads and the
shippers. It does not matter to the responsibility of
the roads, whether they own or simply control the fa-
cilities, or whether they pay a greater or less price to
their lessor."

In *General American Tank Car Corp. v. El Dorado
Terminal Co.,* 308 U. S. 422, 428-429, 60 S. Ct. 325, 329,
Mr. Justice Roberts said: "The lessor . . . is not itself

. . . engaged in any public service. Therefore its practices lie without the realm of the Commission's competence."

In *Central Trust Co. v. Calumet Co.*, 260 Ill. App. 410, 416, it was said: "It is the company which in fact offers its facilities to the public that is conducting a public utilities business and not necessarily the landlord owner of the premises."

We are, therefore, of the opinion that the 1937 Public Utility Law of this Commonwealth did not make Land Company a public utility merely because it owned property which it had leased to Water Company as an operating utility.

We will next consider whether Land Company operated the plant and equipment through Water Company as its agent. In this connection the court below said: "Now, how does The Sayre Water Company operate? We believe, and so find in this case, that The Sayre Water Company is acting as the agent of The Sayre Land Company. The rule of law is that whenever parties by express words or tacit conduct indicate that one acts on behalf of the other, an agency is created. See Brock et al., Exrs. v. Real Estate-Land Title and Trust Company, 318 Pa. 49, 178 A. 146; Restatement of Agency, §1." The *Brock* case had nothing to do with the creation of an agency relation and dealt with the question of determining the scope of authority of an individual who for years occupied the relation of agent to his principal.

In Restatement (2d), Agency, §1; agency is defined as follows: "(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. (2) The one for whom action is to be taken is the principal. (3) The one who is to act is the agent." In §33, comment a of the Restatement (2d), Agency, it

is stated that "The agency relation is normally the result of a contract and is always the result of an agreement between the parties. . . . The implicit, basic understanding of the parties to the agency relation is that the agent is to act only in accordance with the principal's desires as manifested to him."

It will, therefore, be necessary for us to first consider the written agreement between Land Company and Water Company to determine whether an agency relation was created by that agreement. The original agreement and amendment in this case create simply a lessor and lessee relationship.

The lease was subject to a mortgage dated May 1, 1885 in the sum of $75,000.00 from Land Company to the Girard Life Insurance Annuity and Trust Company. The lease contained numerous covenants by lessee Water Company relating to payments of rent, maintenance, payment of taxes, subletting, indemnification of lessor by lessee in connection with lessee's use of the property, deposit of capital stock of Water Company with Land Company as collateral security and remedies of lessor on default by lessee. The agreement recognizes the complete responsibility of Water Company as lessee in the "use, management and control of the hereinbefore demised premises and property in the business of the Lessee connected therewith. . . ." Even though the rents are measured by net profits, this fact does not create an agency relationship. For over 60 years the rental provision in the 1896 amendment has provided no more than fair compensation for the use of the property leased to Water Company. The annual rentals received in evidence for the years 1951, 1952 and 1953 were respectively $21,496.41, $9,699.61 and $17,617.79. The valuation of the property for which this rental was received is approximately one million dollars.

In Handbook of the Law of Partnership, by Crane, at pages 58 and 59, in §17, the cases are collected on the subject of profit sharing as rent to a landlord. It is there said: "If the owner of premises in which another is to carry on a business is to receive as rent, not a share in the gross product or income, but a share in net profits, it is not partnership, if only a landlord and tenant relation is intended and not a jointly operated business. It is sometimes difficult to classify the relation where the owner is, for his better protection, given some share in control of a business . . . . In such situations the question of partnership or not turns upon the degree of control and participation in management on the part of the landlord or owner." More than receipt as rent of net profits of lessee is required before an inference can be drawn that a lessor has control. Professor Crane illustrates the incidents of control that must be given the lessor before this question of degree reaches the point where it may legitimately be inferred that the lessor has such control as to constitute the lessor a principal and a partner. It must also be remembered that the rentals were not taken into consideration by the Commission in the three rate cases involving this utility. In each case the leased property was treated as part of Water Company's rate base, thereby automatically eliminating from consideration the propriety of rentals paid by Water Company to Land Company for the leased property.

The lease involved in this case does not give the lessor the right to control the property leased to the lessee. On the contrary, it is made the duty of the lessee to do many things which are inconsistent with control by the lessor. This lease is not an operating agreement, as was the case in *Wilson v. P. S. C.*, 116 Pa. Superior Ct. 72, 176 A. 510. The interpretation of the lease by the parties themselves for a period of more than 60 years is some evidence as to whether the par-

ties considered themselves as principal and agent or merely as lessor and lessee. The Water Company for this long period of time has been in complete control of the operation. Water Company has at all times complied with the provisions of the Public Service Company Law and of the Public Utility Law. Land Company has never applied for a certificate of public convenience or filed reports. Everything that a public utility should do, Water Company has done. If we go beyond the terms of the lease and examine the evidence in this case we find nothing to warrant the inference that Land Company controls Water Company.

Land Company is not a holding company because Land Company owns no stock of Water Company. If Land Company were a holding company it would have power as principal stockholder to elect directors of Water Company and thus control Water Company. The great majority of stockholders in Land Company are not stockholders in Water Company. This is not a case of one man control of two corporations, as was the case in *Armour Transportation Co. v. Pa. P. U. C.,* 154 Pa. Superior Ct. 21, 34 A. 2d 821, or of control of two corporations by a group of common stockholders.

There is no good reason in this case for making an exception to the basic doctrine of corporate entity. The Commission has for many years effectively regulated the Water Company as a separate corporate entity. See *Pa. P. U. C. v. Sayre Water Company,* 31 Pa. P. U. C. 1; *Pa. P. U. C. v. Sayre Water Company,* 34 Pa. P. U. C. 229; *Pa. P. U. C. v. Sayre Water Company,* 37 Pa. P. U. C. 455. The Commission has been able to properly regulate Water Company and see that proper rates are charged for the service which it renders. In the rate proceedings of Water Company heretofore disposed of by the Commission the original cost of the plant and equipment leased by Land Company to Water Company was available. The rules here-

tofore in effect do not require Water Company to produce the original cost figures. This, however, may easily be remedied by the adoption of additional regulations to cover the situation. Furthermore, the burden is upon the Water Company to establish all of the basic facts necessary for consideration by the Commission when it seeks a rate increase: *Phila. v. Pa. P. U. C.*, 173 Pa. Superior Ct. 38, 48, 95 A. 2d 244. If Water Company should fail to produce the original cost figures of the leased property it would not meet the burden thus imposed upon it and the Commission could, for this reason alone, deny any increase in rates. It seems to us that this gives the Commission adequate power to properly control the matter. Land Company and Water Company are affiliated interests under art. VII of the Public Utility Law, 66 PS §§1271-1276. If the Commission had had jurisdiction over the affiliated corporations as themselves public utilities because of their control over operating utilities, there would have been no point to enacting art. VII. Article VII was predicated upon the lack of Commission jurisdiction over the affiliated or controlling corporations.

It might also be argued that Land Company could terminate the lease. If this were to happen Water Company, being a public utility, through the right of eminent domain could acquire the leased property. While it may not, under the terms of the lease, issue new capital stock without the consent of the lessor, it could undoubtedly raise the necessary capital for the acquisition by the sale of bonds.

The court below found that the predominant portion of the business of the Land Company consists of real estate operations other than the leasing of property to Water Company. In 1951 72 per cent of the revenue of the Land Company was derived from real estate operations other than the leasing of property to the Water Company; in 1952 95.5 per cent was derived

from such other real estate operations; in 1953 65.2 per cent was derived from such other real estate operations. The business of Land Company was not affected with a public interest and could not be regulated as a public utility without violating both the Federal and State Constitutions: *Hertz Drivurself Stations, Inc. v. Siggins,* 359 Pa. 25, 58 A. 2d 464.

The court below also found: "That for the year of 1953, real estate taxes for school, county and borough purposes, in the total amount of $1,395.00 were assessed and levied on the real estate owned by The Sayre Land Company and leased to The Sayre Water Company. Such assessment and levy were upheld by the Court of Common Pleas of Bradford County, by its opinion and order handed down on March 22, 1954, at No. 11 September Term, 1953, in the appeal taken from said assessment, entitled 'In re Appeal of The Sayre Land Company,' on the ground that The Sayre Land Company is not a public utility and therefore not exempt from the payment of said real estate taxes." If Land Company should now be declared to be a public utility, would the leased property and all of its other real estate be exempt from local taxation? This and other complications may be avoided by having Land Company remain a private corporation and not a public utility. The great portion of Land Company's business, which is the rental and sale of real estate, could not be properly regulated by the Commission. To attempt such regulation would, in our opinion, constitute an unconstitutional exercise of power. To declare Land Company a public utility is utterly unnecessary in order to secure to the public protection from improper operation of the Water Company as a utility. The public may be entirely protected by the regulation of Water Company alone.

We are, therefore, of the opinion that Water Company was not an agent of Land Company and Land

Company did not operate it. If the time should ever come that Land Company does actually operate this utility business, the Commission has ample power to impose its regulatory functions to properly protect the public.

Decree reversed and the case is remanded with instructions to the court below to enter a proper decree as prayed for in the complaint.

———

DISSENTING OPINION BY WRIGHT, J.:

It is my view that we should look through the veil of corporate structure to consider the realities of the instant factual situation. While the Land Company is merely the owner from a technical standpoint, it is actually the operator, receiving all of the earnings in excess of $300.00 per year. Apparently the arrangement between the two corporations is being used as a means of frustrating acquisition of the facilities by the boroughs involved. I respectfully submit that, on this record, regulation by the Commission is in the public interest and its jurisdiction should be sustained.

———

DISSENTING OPINION BY FLOOD, J.:

I join in Judge WRIGHT's dissent. A number of considerations compel me to this conclusion.

1. None of the cases cited by the majority indicates that an owner of public utility property is not itself a public utility when it owns practically all of the facilities used or useful in the service being rendered to the public and transfers such property only on a year to year basis to another company which receives merely a fixed nominal sum for operating the facilities, all prof-

its over and above such sum being retained by the owner.

2. We do not have here a situation like that in *Citizens' Passenger Railway Co. v. Public Service Commission*, 75 Pa. Superior Ct. 238 (1920), reversed, 271 Pa. 39, 114 A. 642 (1921), where the company owning the facilities had leased them for a fixed rental for a long term. This contrasts strongly with the year to year lease to the Water Company here, with the lessor getting, not a fixed rental, but all of the profits.

3. In the *Citizens' Passenger* case the lessor, having parted with its property and franchises for a long term for a fixed annual rental, retained no control over the operations, either expressly or by implication.

4. As the Supreme Court said in the *Citizens' Passenger* case the lessor company there had "no rates to make or collect, no service to render to the public and no facilities to furnish or extend". 271 Pa., at p. 55. This is not so here.

5. In this case the facts in the record lead inescapably to the lower court's conclusion that the rate-making function is exercised by the Water Company as the agent of the Land Company which alone benefits or is injured as a result of higher or lower rates. The Water Company stockholders have no more interest than if they were Land Company bondholders entitled to a return sufficient to pay the sum of $300 annually which is equal to six per cent upon their original investment.

6. When it is necessary to extend facilities of the Water supply system, this extension is made either out of Land Company's funds or out of receipts from operations which would otherwise go to the Land Company as profits. It is unrealistic to say that these extensions under these circumstances are not made by the Water Company as agent for the Land Company.

7. It may be true, as the majority says, that the word "owning" in the Public Utility Code does not automatically make the owner of facilities used to furnish water to the public a public utility. Yet even where the lessee is the actual operator of the facilities, it cannot be overlooked that this court in the *Citizens' Passenger Railway Co.* case, supra, said (at pages 251-252, 75 Pa. Superior Ct.):

"We are not prepared to accept as sound, the broad proposition advanced by counsel for the appellants, that the Public Service Commission has no jurisdiction over the underlying companies, the present appellants. They are existing corporations under the laws of the State of Pennsylvania. They are the final owners of a vast property, which for years has been devoted to a public service and which is today being operated as a public service company engaged in a service vital to the vast population which constitutes the City of Philadelphia. They were chartered as public service companies, and so long as they live and move and have their being under and by virtue of those charters, they must remain public service companies."

8. The fact that the lessors in the *Citizens' Passenger Railway Co.* case had been chartered and had for years operated as a public service corporation does not render the above statement of this court inapplicable to the lessor here. If the Land Company acts, by itself or through an agent, as a public utility it will be held subject to regulation as a utility irrespective of its charter right so to act. *Pa. Chautauqua v. Public Service Commission*, 105 Pa. Superior Ct. 160, 160 A. 225 (1932).

9. Even though the relation between two companies is in form a lease, it will be construed to be an agency relationship if that is in fact what it is. *Wilson v. Public Service Commission*, 116 Pa. Superior Ct. 72, 176 A. 510 (1935). In this case there is more pow-

er of control retained by the lessor than there was by the lessor in the *Wilson* case.

10. It is true the Land Company is not the owner of the stock of Water Company and the majority in number of stockholders in the Land Company are not stockholders in the Water Company. On the other hand, the record does not support the statement of the majority that this is not a case of control of two corporations by a group of common stockholders. The record shows that twelve shareholders of the Land Company, who own seventy-three per cent of that company's stock, own all of the stock of the Water Company. There is therefore effective power to control the two companies by a group of twelve shareholders or less. The history of the two companies, as set forth in the record, indicates that those shareholders and their predecessors have been acting harmoniously over many years.

11. It should be noted that under the terms of this lease the Water Company received $300 annually for operating this public utility in the first year following the modification of the lease in 1896, and is still receiving $300 annually for operating it sixty-five years later in spite of the great intervening increase in the cost of management of such an enterprise. It is hard to see how the Water Company is doing anything other than acting exclusively or almost exclusively for the Land Company's interest in this operation.

12. I see nothing in the law or the record to indicate that the commission by merely changing its rules or regulations may compel the Water Company to produce the books or records of the Land Company if the Land Company is not a public utility. The commission argues that it has not been able to get all information it needs. If it cannot get it directly from the Land Company I do not see how it can force the Water Company to compel the Land Company to produce it for the com-

mission's benefit. Nothing that I can discover in the language of the Public Utility Code gives the Public Utility Commission authority to make rules and regulations to govern anyone other than a utility.

13. Cooperation by the Land Company in making information available when an increase of rates is sought by the Water Company on its behalf is to be expected. This does not assure the commission of such cooperation in other circumstances.

14. To say that the Water Company, being a public utility company, could acquire the leased property through the right of eminent domain is beside the question in my opinion. Its failure heretofore to do this or to do any other act contrary to the interest of Land Company tends to confirm the existence of a tacit understanding or agreement that Water Company shall act as agent for Land Company.

15. The argument that the Public Utility Commission cannot regulate the Land Company because its income is to a major extent derived from real estate operations is also not determinative of the question. It may nevertheless be regulated insofar as it is carrying on the business of a public utility. Cf. *Pa. Chautauqua v. Public Service Commission,* supra.

16. The majority suggests that a decision holding the Land Company to be a public utility might result in the exemption of these facilities from real estate taxes and that this would be an unfortunate result for the local municipalities. As a matter of fact, it appears that for many years prior to 1953, the Land Company did get such an exemption because of the confusion created by the two functions which it performed. This does not seem to me to furnish a sound argument for refusing to hold that it is performing the functions of a public utility.

17. In its able and exhaustive brief, the appellant argues that an agency relation cannot be found unless

"there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Restatement (2d), Agency, §15. But like any other facts such manifestation by the principal and such consent by the agent may be inferred from the circumstances. In other words, ". . . authority to do an act can be created [not only] by written or spoken words . . . [but by] other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Restatement (2d), Agency, §26. I agree with the lower court that the parties' conduct in this case leads to the inevitable inference that the Water Company is acting as the agent of the Land Company and that there is at least a tacit agreement or understanding between them that this should be done.

18. The fact that the Public Utility Commission or its predecessor, the Public Service Commission, has not hitherto sought to regulate the Land Company is no proof that it has not been performing public utility functions. The commission may not have thought such regulation necessary in the earlier period. The Land Company's primary interest is to develop real estate and it may have felt and may still feel that the way to attract homeowners and industries to the area is to keep the rates for water as low as possible. It may therefore have been to the Land Company's interest to keep the water rates at the minimum sufficient to maintain the service efficiently, and it may, indeed, have done so. But this does not prevent the commission from regulating it now. The Commonwealth cannot be held estopped by nonaction on its part.

19. Finally, I regard as the controlling authority in this situation, not the *Citizens' Passenger Railway Co.* case, supra, relied upon by the majority, but *Wilson v. Public Service Commission,* supra, where the lease

was held to be in reality an operating agreement, and the lessee the agent of the city which owned the facilities. This was held to be an agency agreement instead of a lease despite the facts that (1) the lease could be terminated only at the end of a ten year period; (2) the rate-making authority was not retained expressly or inferentially by the city, the owner of the facilities but by a commission of three of which the city appointed one member, the operator a second, and these two chose a third; (3) the city, as owner of the facilities, was to receive a fixed rent, not profits, whereas the operating company's fee was to vary depending upon the efficiency of management as reflected in the cost of gas and the growth of the business to be calculated according to a prescribed formula; and (4) while the contract provided for certain standards of operation, the city could not enforce these standards by directly terminating the lease or other direct action, but only through court action for liquidated damages or forfeiture upon proof of failure of the operator to comply with the standards.

There were fewer factors present in the *Wilson* case than are present in the case before us to warrant the finding of agency. Yet this court said, speaking through Judge KELLER: "The City of Philadelphia is still the owner of its gas plant. The plant is being operated under the contract by an agent which receives a limited compensation proportioned to its efficiency, but with a fixed maximum . . ." 116 Pa. Superior Ct., at page 80. "[The] contract was . . . really an operating agreement, and . . . limits the compensation of the operating company to a fixed annual fee, with a limited extra payment based on its efficiency in management, and turns back all profits over and above that fee to the city either by improvements to the works or by lowering the price of gas to the public . . ." Id., at page 81.

I would affirm the judgment of the court below.