PUBLIC UTILITIES COMMISSION, State of Hawaii, Plaintiff-Appellant *v.* HONOLULU RAPID TRANSIT CO., LTD., Third-Party Plaintiff-Appellee *v.* CITY AND COUNTY OF HONOLULU and M.T.L., INC., Third-Party Defendants

NO. 5456

JANUARY 13, 1975

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR, JJ., and SHINTAKU, Circuit Judge, assigned by reason of vacancy

116

This is an appeal by the Public Utilities Commission from summary judgment granted by the first circuit court in favor of Honolulu Rapid Transit Company, Limited.

Under HRS § 269-30[1] the Public Utilities Commission, hereinafter PUC, seeks to assess Honolulu Rapid Transit Company, Limited, hereinafter HRT, one-eighth of one per cent of its gross income from public utility business in calendar year 1970. HRT contends that it was not a "public utility" in 1971 and therefore is not subject to the fee. The issue is whether HRT was a "public utility" within the meaning of HRS § 269-30 during 1971.

The relevant facts as set forth in the affidavits and as found by the trial judge follow:

In 1970 HRT appeared to be caught between a static fare structure and labor demands. HRT had been operating under a fare structure established in 1961. HRT notified the Teamsters and Allied Workers Local 996, hereinafter the union, on March 2, 1970 that HRT could not negotiate a new contract because of HRT's financial situation. On June 8, 1970, the union sought a 50-cent per hour increase for all employees. Negotiations commenced on July 23, 1970 and continued through the expiration of the contract until December 31,

---

[1] § 269-30 Finances; public utility fees. Section 607-5 to 607-9 shall apply to the public utilities commission and each commissioner, as well as to the supreme and circuit courts and the justices and judges thereof, and all costs and fees paid or collected hereunder shall be deposited with the director of finance of the State to the credit of the general fund.

There shall also be paid to the commission in each of the months of July and December in each year by each public utility which is subject to investigation by the commission, a fee which shall be equal to one-eighth of one per cent of the gross income from the public utility business carried on by the public utility during the preceding year, or the sum of $15, whichever is greater, provided that in the case of a public utility to which the Civil Aeronautics Act of 1938, as amended, applies, the fee shall be equal to one-twentieth of one per cent of the gross income from the public utility business carried on by the public utility during the preceding year, plus one-fiftieth of one per cent of the par value of the stock issued by the public utility and outstanding on December 31 of the preceding year. This fee shall likewise be deposited with the director of finance of the State to the credit of the general fund.

1970, when the union struck. HRT did not operate any buses after the strike began.

At the same time, the City was moving to maintain service through another corporation. The City Council resolved on August 25, 1970 to acquire HRT's assets and business by requesting the PUC to establish valuation of HRT property according to the franchise. On September 8, 1970 the Council passed Bill No. 109 authorizing the Mayor to purchase the physical and tangible property of HRT, and the Council petitioned the PUC for the valuation of HRT property. On September 14, 1970, Mass Transit Lines, Inc., hereinafter MTL, was incorporated under state law. The Council on February 25, 1971 authorized the City to enter a management contract with MTL to manage a mass transit system, and on February 28, 1971 MTL and the union entered a labor agreement which provided the 50-cent per hour wage increase sought by the union from HRT. Mass transit operations in the City resumed on March 1, 1971 conducted by MTL and the union.

The PUC made demands in 1971 for fees allegedly due from HRT under HRS § 269-30; HRT did not pay, and the PUC brought an action for a statutory account.

HRS § 269-1[2] defines a "public utility." In this case a "public utility" must have the following elements:
1) It is a "person"
2) who owns, controls, operates, or manages
3) as owner, lessee, trustee, receiver, or otherwise,
4) under a franchise, charter, license, articles of association, or otherwise,

---

[2] § 269-1 Definitions. As used in this chapter:

"Public utility" means and includes every person who may own, control, operate, or manage as owner, lessee, trustee, receiver, or otherwise, whether under a franchise, charter, license, articles of association, or otherwise, any plant or equipment, or any part thereof, directly or indirectly for public use, for the transportation of passengers or freight, or the conveyance or transmission of telephone or telegraph messages, or the furnishing of facilities for the transmission of intelligence by electricity by land or water or air within the State, or between points within the State, or for the production, conveyance, transmission, delivery, or furnishing of light, power, heat, cold, water, gas, or oil, or for the storage or warehousing of goods; provided, . . . .

5) any plant or equipment, or any part thereof,

6) directly or indirectly for public use, [and in this case]

7) for the transportation of passengers or freight.

With respect to the statutory definition the record in this case indicates the following: HRT is a corporation (and a corporation may be a "person," HRS § 1-19). While the affidavits filed by the PUC and HRT in support of their motions for summary judgment do not set forth these facts, the trial court found that HRT possessed a franchise during 1971, the year for which the PUC seeks to collect the tax, and that HRT retained all of its assets after the strike began on December 31, 1970, with the exception of 41 buses which it sold to the City and County in early 1971. Presumably HRT did own as owner under a franchise some plant and equipment in 1971, but the record does not disclose whether such property was owned "directly or indirectly for public use for the transportation of passengers or freight." The question of whether HRT totally ceased doing public utility business, given the facts above, is not proved by legal conclusions in affidavits.[3] Further fact-finding is accordingly necessary.

On the subject of statutory interpretation, we note that the phrase "directly or indirectly for public use" appears quite broad in the context of "owning as owner under a franchise any plant or equipment directly or indirectly for public use for the transportation of passengers," an applicable statutory definition. Appellee HRT argues that owners of property qualify as public utilities only if their property is actually used for public use. Whether the phrase "for public use" refers to the intended use or the actual use of the property involved, ownership for such use must be examined in both its direct and indirect context.

Representation was made to this court that HRT leased buses to MTL and the issue is raised whether such a lease might qualify as ownership "indirectly for public use." Case law indicates that a mere "inactive lessor" is not a public

---

[3] Howard Hoddick's affidavit for HRT states that HRT did not receive revenue from public utility operations since December 31, 1970. This legal conclusion as to the identity of HRT's revenue is only correct if HRT received no revenue at all.

utility, *Columbia Gaslight Co. v. Mobley,* 139 S.C. 107, 137 S.E. 211 (1927); *Sayre Land Co. v. Penn. P.U.C.,* 196 Pa. Super. 417, 175 A.2d 307 (1961), *aff'd,* 409 Pa. 356, 185 A.2d 325 (1962). However, even if HRT is merely a lessor of equipment we think that *Sayre Land Co., supra,* and its dissent properly suggest several factors of the lease arrangement that must be examined. For example, the trial court must determine whether an agency relationship exists between lessor and lessee, the length of the lease, the nature of the rent, and the amount of control retained by the lessor.

In general one who interprets HRS § 269-1 must bear in mind that the statutory scheme of HRS ch. 269 displays a public policy that favors PUC jurisdiction over activities where the public welfare depends on proper conduct and regulation. For example, the scope of the PUC's investigatory power under HRS § 269-7 is very broad. HRS § 269-19 bars a public utility from disposing of its assets without PUC approval. The very fee system of HRS § 269-30 which supports the PUC's investigation capability covers the situation where a public utility has no gross income from public utility business carried on in the previous year.[4] Thus there may be a situation where a public utility earns income in years one and three but no income in year two; one cannot say on those facts alone that it ceased to be a public utility in year two.

There is a particular reason for favoring PUC jurisdiction when a public utility terminates its business. PUC investigatory power under HRS § 269-7 only covers "public utilities," so once a public utility loses its legal status as such it is free from PUC investigation. Whether or not investigation is needed or has been conducted in this case is irrelevant: the public interest favors PUC power to investigate the reasons why a company ceases to serve the public.

---

[4] HRS § 269-30 provides that a public utility may be assessed $15 or ⅛ of 1% of its gross income from public utility business during the preceding year, whichever is greater. The $15 fee implies that a public utility remains such when in the previous year it grosses less than $12,000 from its public utility operations (⅛ of 1% of $12,000 equals $15), and even when it grosses *nothing* from public utility operations.

While we do not mean to imply that a fully operating company cannot be a public utility merely because it lacks a franchise, we look to the possession of a public utility franchise as a significant indicator of the company's status. At the very least, the franchise keeps alive the possibility of the company's reentry into active service. The continued retention of assets in this case, especially the operating equipment, reinforces the possibility of resumed operations. In any event, we do not believe that the statute favors having a company's legal status in this area depend on self-serving declarations of intent, and the surrender of the franchise is a clear objective act which, in the context of discontinued operations, unmistakably indicates the company's abandonment of all hope of continuing service.

Reversed and remanded for further proceedings in accordance with this opinion.

*Harry S. Y. Kim,* Deputy Attorney General *(George Pai,* Attorney General, with him on the briefs), for plaintiff-appellant.

*Arthur B. Reinwald (Anthony Hoddick Reinwald & O'Connor,* of counsel; *David A. Ezra* with him on the brief) for appellee.